THE STATE OF MISSOURI at the Relation and to the use of J. M. SHORT, Guardian and Curator of the Estate of GRACE MILLER, GOLDIE MILLER and HENRY MILLER, Respondent, v. H. B. HARDY, EDW. C. NISCHWITZ, G. F. TISING, HEMAN C. TISING and JOHN L. TISING, Executors of the Last Will and Testament and Estate of J. F. TISING, deceased, Appellants.

Kansas City Court of Appeals, December 2, 1918.

1. **PUBLIC ADMINISTRATORS: Guardians and Curators: Liability on Bond.** A public administrator was made guardian of the estate of some minors and kept the money of their estate all in one fund and converted part of the fund to his own use. Thereafter, before the conversion was discovered, at the termination of his term of office, he gave a new bond as guardian in his private capacity. *Held*, that the sureties on the last bond cannot be held liable for the amount converted while the principal was public administrator and before they executed the bond.

2. **GUARDIAN AND WARD: Evidence: Conversion.** Where the guardian of a number of estates kept the money of the estates all in one fund and converted part of it to his own use prior to

the execution of a new guardianship bond, the guardian in an action against the sureties on the new bond, will not be allowed to testify that the conversion was from the money of any ·certain estate.

3. ———: **Principal and Surety: Final Settlement: Sureties.** A final settlement of a guardian, showing certain sums due the ward is not binding on the sureties on his bond, where they can show that the default causing the loss was committed under a prior bond before their bond was given.

Appeal from Moniteau Circuit Court.—*Honorable J. G. Slate,* Judge.

REVERSED AND REMANDED.

*S. C. Gill* and *J. B. Gallagher* for appellants.

*Embry & Embry* for respondent:

TRIMBLE, J.—Defendant Hardy was Public Administrator and ex-officio Public Guardian and Curator of Moniteau county for three sucessive terms, the last of which ended January 1, 1909. During his last term, and on July 30, 1906, he was ordered by the probate court to take charge of the persons and property of Grace, Goldie and Henry Miller, minors. He did so, and continued as Guardian and Curator of said minors through the remainder of his term and thereafter until November 9, 1914, when he voluntarily appeared in the probate court and asked to be permitted to execute a new bond as guardian and curator and that his bond as public administrator be discharged. The court made an order permitting him to execute said new bond, which he did; and same was filed and approved by an order which further directed that "the said bond as public administrator as aforesaid be, and the same is hereby, finally discharged from further liability in this behalf."

Hardy continued as guardian and curator, under said new bond, until November 26, 1917, when, upon proof of the publication of four weeks' notice in a news-

paper of the presentation of his application for permission to resign, he filed what the probate records term a "final settlement" showing a balance due the estate of $3183.61, which amount the probate court ordered to be forthwith paid over to his successor Short, who, on the same day, was duly appointed and qualified as such. Hardy aso filed his resignation which was accepted by the court; but he failed to pay over to his successor the balance found to be due or any part thereof.

Whereupon his successor brought this suit on the aforesaid bond against him and his sureties, one of whom is dead but whose estate is represented herein by his executors. Said bond recites that whereas Hardy had been appointed guardian of the persons and curator of the estates of said minors, "Now, if the said H. B. Hardy shall faithfully discharge his duties as said guardian and curator, according to law, then this bond to be void," etc.

The petition, after alleging the appointment of the successor guardian and the execution of the bond sued upon, set up the resignation of Hardy, the filing of said settlement showing the balance hereinbefore mentioned, the order to pay over said balance, and the demand therefor in open court by said successor; and, for the breach of said bond, charged the failure and refusal of said Hardy to pay said amount as ordered.

Hardy filed no answer but the sureties defended upon the ground that Hardy converted the funds before the execution of the bond sued on; and that on the 9th day of November, 1914, the day said bond was executed, and for at least six months prior thereto, he did not have, and had not had, in his possession or under his control any money notes or personal property *belonging to said heirs* except certain yearly rents from real estate which the sureties alleged had been duly accounted for in his settlements. All this was denied by the reply.

The case was tried before the court without a jury. The judgment recites that the court found that, after

notice of his intention to resign, duly published according to law, Hardy filed his written resignation, made a final settlement and his resignation was accepted; that the said settlement showed he was indebted to said minors in said sum of $3183.61 and that the probate court had ordered the same paid forthwith over to his successor who then and there demanded it of him in open court, but that he had failed and refused to pay it or any part thereof; wherefore, judgment was rendered for $6000, the penalty of the bond, to be satisfied by the payment of $3183.61 and costs. The sureties appealed.

After defendants' demurrer to the evidence had been overruled they asked the court to give two declarations of law, the first to the effect that if the court found Hardy did not have the estate of said minors in his hands or possession at the time of the execution and approval of the bond sued on, but had used it in private business or in settlement of other estates in his hands prior to November 9, 1914, then the fact that he charged himself up in settlements of the estates was not binding upon the defendant sureties and the finding should be in their favor. The second declaration was to the effect that if the court found that at the time of the approval of the bond sued on, Hardy, as curator, had used the assets of said estate in his private business, or in settling up other estates of which he may have been in charge, and did not have said assets in his hand, or in his possession or under his control, *although he was solvent,* then the finding should be in favor of the defendant sureties, notwithstanding the fact that Hardy kept up his settlements as curator and charged himself with the balances thereof as though he had the moneys of the estate in hand. Both of these declarations were refused.

It is defendants' contention, first, that the court should have sustained their demurrer to the evidence; second, that the court erred in refusing each of said declarations.

Prior to and after the giving of the bond sued on, to-wit, November 9, 1914, Hardy made annual settlements with the probate court wherein he charged himself with a balance expressed merely in dollars and cents with no statement as to what the estate consisted of or how it was invested, and the balance on each settlement was carried over into the next in the same way. The balance on the first settlement was a little over $4000 and the balances continued to run between $3800 and $3135.95, the last named sum being the balance on the 8th settlement made August, 1914, the last settlement made before the new bond was executed. This balance was cerried over into the 9th settlement, made in August, 1915, the first settlement under the new bond; and the balance on the settlement made August 19, 1916, was $3211.62 and the last settlement made on November 26, 1917, the date of his resignation, showed a balance, as before stated, of $3183.61.

With reference to whether defendants' demurrer should have been sustained, we think that regardless of the questions hereinafter discussed, the court did right in overruling the demurrer. For, without regard to the time when the conversion occurred, the settlements made under the new bond show that about $450 of rents came every year into the curator's hands and, in accounting for these, Hardy credited himself with various sums for his services. Now, the rule is that a curator who has converted assets of the estate is not entitled to pay for his services since pay is an incident to a *faithful* discharge of the trust. [State to use v. Berning, 74 Mo. 87, 100.] So that, the curator has not fully accounted for the rents that came into his possession after the execution of the bond sued on but owns the said sums which he paid to himself. It would seem that this would justify the court in refusing to sustain the demurrer, and would authorize a judgment for the amount of these credits against the sureties on the bond in suit even if said sureties should not be held responsible for any other amount.

It will be observed that the bond sued on was a new bond given as surety for Hardy as guardian and curator *in his private capacity* and not as public guardian by virtue of being public administrator. Hence it was not an *additional* bond to guarantee the faithful performance of his duties as public administrator and guardian nor are the terms of the bond such as to make is retrospective in character.

For the purpose of showing that liability was on the sureties of his bond as public administrator and not on the present or second set of sureties, the defendant introduced Hardy as a witness to prove that he converted the *heirs* money before the present bond was executed and that he did not have any money of *these* heirs in his official hands at the time the bond in suit was executed, and that none had come into his hands as guardian since, except the rents heretofore mentioned which rents he said he had correctly accounted for and paid out for expenses. His testimony, however, is very indefinite and unsatisfactory. He was asked if he had any of the money or personal property *of the Miller heirs* at the time the bond in suit was executed or at any time for a period of six months before that, and he answered in the negative. But he could not be induced on cross-examination to say *when* he converted the *Miller* money, and his testimony as a whole tends to show that it is only his *conclusion* that he had converted the money *of these heirs* at that time. He kept all funds in his hands as public adminstrator, including the Miller money, in one general fund in a Public Administrator Account at the bank. This account was not introduced in evidence, nor was he able to testify with reference to it and admitted he had not examined it. No showing whatever was made as to *when* this Public Administrator account was exhausted if it ever was. So far as the evidence shows there may have been money in this account at the time the second bond was executed and thereafter, but that he had considered the *Miller* money had been checked out

either in settlement of other estates or in loans on notes made payable to himself personally. But if there was any money in said account, which was an ex-officio guardian account, then such money could as well be said to be *Miller* money as any other. If there was money in said account at the time the present bond was executed, he should not be allowed to say it was not *Miller* money. How could he make a distinction and say no money *belonging to the Miller* heirs was in the account and that the money remaining in the fund belonged to *other estates* when no such distinction existed in the fund? If when the present bond was given, there was money in the Public Administrator account to which that estate could have laid claim, this was an actual holding of funds *as guardian* sufficient to cause his sureties on the personal bond to be liable for a subsequent conversion thereof. For these reasons we do not think the defense of a *prior* conversion was sufficiently established to warrant us in reversing the case outright even if the question of the rents were not in the case.

The testimony in this case is unique and peculiar for another reason. It shows that Hardy all along had, and now has, enough cash in his *personal* account together with the aforesaid notes payable to himself personally, to cover the amount of this estate; that at the time of the *trial* he had notes aggregating between $3100 and $3500; that he could *cash* his other property for at least $2500 and perhaps more. In other words, while the testimony states as a *conclusion* that Hardy converted the funds from his *official* to his private hands, he shows he is not insolvent and that even if he did violate his duty during the time of the old bond, still such violation did not render him *incapable* of *doing his duty* during the time of the new bond by *restoring* the fund and thereafter paying it over to his successor when ordered to do so. His sureties under the new bond agreed to stand good for his breaches of duty occurring after the execution of their bond. One of these duties was to collect moneys due the estate and when done

another duty arose to pay it over when ordered. If during all the time of the second bond he was solvent *and able to replace* the money said to have been theretofore taken, and did not do so, then it is somewhat difficult to see why, in reason and logic, this was not *a breach of duty under the new bond;* and such breach, together with his breach in refusing to pay over when ordered, *caused,* or at least was one of the causes of, *the loss* to the estate. This was not the *sole* cause of the loss it is true; the conversion during the time of the new bond *also* caused it, and for this reason the first bondsmen are *also liable.* In the situation aforesaid, it would seem that *both* sets of bondsmen ought to be liable to the estate, though, of course, the latter could have but one satisfaction. This would not result in injustice to the second set of bondsmen since they would have the right to have contribution of the first set, and the estate meanwhile, for whose benefit both bonds were given, would be withdrawn from litigation.

There is no question, however, but that the general rule is that "where an officer proves a defaulter, and has held the office under different appointments with several sets of sureties, it must now be conceded by established precedent that the sureties will be responsible who were on the bond at the time the defalcation occurred." [State ex rel. v. United States F. and G. Co., 188 Mo. App. 700, 704 and cases cited.] The rule is further that such sureties are liable only for those breaches occurring after the execution of the bond on which they are obligated and they are not liable for *prior defaults* unless made so by the terms of the bond. [State to use v. Jones, 89 Mo. 470, 480; State ex rel. v. Chatham Nat'l. Bank, 98 Mo. 532, 573.] This rule applies in the case of guardians the same as in that of other officers; and "in order to determine which set of sureties are liable, it is only necessary to ascertain when the defalcation occurred, for each set of sureties is liable for the malfeasance which their principal commits during the period they were standing for him."

[State ex rel. v. Holman, 93 Mo. App. 611, 617 and cases cited.]

The foregoing statements of the general rules are well enough and cause no difficulty when the sureties sued are those on the bond *at the time the funds were converted;* and the general statement of the rules above mentioned cause no difficulty even when the suit is against a set of sureties who became such *after* the conversion, if the principal was not, during the continuance of the second bond, *able to return* the fund theretofore converted. But is it strictly and logically accurate to apply the above general rules so as to *absolutely exonerate* the sureties on the second bond, even though the *technical* coversion took place prior to the giving of said second bond, *if,* notwithstanding the prior conversion, the principal was solvent and *able to replace* said fund during the entire existence of said second bond. For example, a curator under one bond converts property of his ward by changing it from his official to his personal possession, but *remains solvent and able to replace it.* While matters are thus, he gives a new bond. The sureties under this last bond do not obligate themselves to stand good for such prior conversion, nor any prior breaches of duty. Nor should they be required to pay for any *loss* occasioned *solely* by such prior conversion or breaches. But if by reason of the prior conversion and the subsequent solvency and ability of the principal to replace the fund, the loss results from both the prior and subsequent breach why should not the estate be entitled to look to both sets of sureties, requiring them to ultimately adjust their liabilities between themselves? The preservation of the estate is what the two bonds were given for. And if it is difficult to fix ultimate liability because it is difficult to ascertain when solvency or insolvency exists, that is a difficulty which the bondsmen should shoulder. It is true the second set of bondsmen do not agree to stand good for *prior* breaches, but in the present instance are there not *two* breaches, one arising under the first bond and the other under the second, both of which have contributed

to cause the loss? The second bondsmen do agree to stand good for the failure of their principal to perform the duties incumbent upon him *after* their bond was executed. Among these duties thus subsequently arising is first to *replace the fund* in the guardian's *official* hands and next to pay it over when required. Of course, the sureties do not agree to stand good for a failure to discharge a duty that was *impossible* at and before the time the bond was executed; but *if he was able* to discharge it, then it was not impossible. If it be said the sureties only agreed to be responsible for the funds actually in the guardian's *official* hands at the time of the execution of the bond, it can be said in reply that the terms of the bond do not so provide. As a matter of fact they are liable for all funds which the guardian could have collected from some other person but did not. Why then should they not be liable for funds he could have collected from himself but did not? For a failure to turn over the balance due on final settlement, the bondsmen ought to be *technically* liable even though the defaulting principal never was able during the time of the second bond to replace money he had theretofore converted, but, in such case, they would be liable in *nominal damages only,* since the *loss or damage* was caused *solely* by the breach of duty prior to the second bond and not by the technical breaches thereafter. But where the curator, after such prior breach of duty *remains solvent* after giving his second bond, and fails to perform duties which he *could have performed* because he was solvent, then is there not also a breach of duty under the second bond, a breach which has caused, or has joined in causing, the loss? If this be so, then it would seem that the sureties on the second bond should not be wholly *absolved* from liability. The fact that the first set of bondsmen are also liable for the breach under their bond ought not to *exonerate* the second set so far as the *estate* is concerned. The second set should be released only when the first breach was the *sole* cause of the loss.

While the view advanced in the foregoing appears at first glance to be opposed to all the decided cases, yet, to my mind it is not really opposed thereto. The facts in most if not all of such cases are not like the peculiar situation here. They are cases where the principal was insolvent and where the court is deciding whether the sureties on the bond in force at the time the defalcation occurred should escape liability. The question whether or not the *second* set might not *also* be liable for the same *loss* though not the same *breach,* was not being considered.

That both sets of bondsmen may be liable for the same loss though not the same breach, the first for converting the funds and the second for the guardian not replacing it *when he could,* see the remark of SHERWOOD, J., in State to use v. Berning, 74 Mo. 87, 1. c. 97-8 where it is said: "The doctrine distinctly asserted in the case just cited, (State v. Drury, 36 Mo. 281), is that if a conversion takes place during the time of the first bond, whereby a loss occurs, the obligors therein must be held liable, notwithstanding a breach and a liability occurred. also under the second bond. It quite often may happen that a breach of a bond is a continuing breach, commencing during the period of the first bond and extending down to and through the period covered by the second bond; where the maladministration would be a breach of both bonds; and this seems to have been the case here. In such case the relator might well have judgment on both bonds but of course could have but one satisfaction." The property in that case was a note pledged by the principal, during his first bond, to secure his individual debt. He could have *reclaimed the note* at any time, since the pledgee knew it was the estate's property. If he *could replace* the property at any time it is not seen why there should be any difference in the case of a note and any other indebtedness or asset. In the case at bar, Hardy was not shown to have been insolvent at the time the new bond was executed but on the contrary appears to be still solvent; and hence his failure under the new

bond to replace the money he says he had theretofore converted, that is, changed from his official to his personal hands was, it seems to me, as much a breach of his duties under the new bond as if he had failed to collect a debt from any other debtor of the estate which could have been collected had he performed his duty.

In Tittman v. Green, 108 Mo. 22, the suit was against the second set of Branch's sureties, and the evidence was that he was solvent at and after the time the second bond was given, and though he had converted the fund prior to the giving of the second bond, yet the judgment against the second set of bondsmen was upheld. At page 33, the general rule, hereinbefore mentioned, is referred to and there Judge GANTT says, "But it is conceived that these principles of law, however well settled, do not of themselves solve the difficulties of this case."

Later on, at page 35, he speaks of the necessity of a "careful discrimination here" and, after fully agreeing that a fiduciary cannot by his mere *naked* election, (i. e. that *and nothing more*,) transfer his mere indebtedness to himself in one capacity to himself in another capacity so as to exhonerate his sureties in the one and throw the burden upon his sureties in the other, says "To make the transfer valid, it must consist of something more than a mere naked liability. It must be substantial assets if made by an *insolvent* fiduciary."

In a subsequent suit against Branch's sureties under his first bond, the decision on the first appeal thereof (State ex rel. v. Branch, 112 Mo. 661), shows there was no evidence that Branch was insolvent (see p. 668), and the court again announced the rule adopted in the Tittman case saying, in italics, that there must be a transfer of substantial assets if made by an *insolvent debtor.* (p. 668). Again, the court, speaking of the time when the second bond was executed and the trustee succeeded the curator, says p. 673, "If at that time he *actually had her estate in his hands, or was solvent and able to turn over her estate,* his election by this distinct act or declaration affected the transfer, and such election

will bind the sureties on his bond as trustee. [Tittman v. Green, 108 Mo. 22; Smith v. Gregory, 26 Gratt. 248; Ruffin v. Harrison, 81 N. C. 208; Ruffin v. Harrison, 86 N. C. 190; Gilmer's Adm'r. v. Baker's Adm'r., 24 W. Va. 72.] On the other hand, if he was *insolvent* when he filed the receipt, and did not have her estate in his hands, but had misappropriated it, then she had a right to show that fact to bind him and his sureties on his guardian bond, for this was a breach of their undertaking.'' The case was then reversed and remanded because the plaintiff had not been allowed to show that Branch was insolvent. Of course this seems to be a holding that if he was solvent at the time or after the new bond was given, then even if he did not actually retake the funds into his official hands as trustee, the first set of bondsmen would be *released*. If they were, the liability would rest alone on the second sureties. However, the decisions in the later appeals of the case do not so hold. [126 Mo. 448; 134 Mo. 592; 151 Mo. 622.] They clearly hold that, so far at least as concerns the liability of the sureties on the first bond which was in force when the conversion took place, the fact of solvency or insolvency made no difference. It required the actual transfer of substantial assets into the official hands of the trustees to *release* the first set of bondsmen. This is right because if the assets *actually went back* into his official hands as trustee, his second capacity, then the failure thereafter to pay them over was the breach and the *only* breach that *caused the loss*. And for this the second bondsmen and they alone *would* be liable. But even if he were solvent and therefore could have, but did not, replace the funds into his hands as trustee, nevertheless the first bondsmen ought not to be *absolved* because, in that event, the breach under their bond still was a cause or one of the causes of the loss. Is the holding on the aforesaid later appeals of the Branch case to be interpreted as impledly holding that, regardless of the solvency or insolvency of Branch, if no substantial assets actually went into his hands as

trustee, the *second* set of bondsmen *would not be liable?* The court was not then dealing with their liability or with the question of whether *both* sets may not have been liable to a judgment in favor of the estate but with the right in the estate to only one satisfaction and the right of contribution existing between the two sets of bondsmen. And in the said later appeals it was shown beyond question that Branch was insolvent and had wrecked his own and his ward's estate at the time of the change from curator to trustee. So that even if the question of whether *both* sets of bondsmen were liable had been before the court, yet it could have rightfully held that the second set were *not* liable because the only breach that *caused the loss* was the breach under the first bond.

The principle that the sureties on Hardy's second bond ought to be held for his failure to replace the money theretofore converted, *if* he was solvent and *able to replace* it during the existence of the second bond, appears to be deducible from what MACFARLAND, J., says in the decison of the third appeal in the Branch case, 134 Mo. 592, l. c. 602-3, where he says:

"When Branch was appointed trustee, he assumed the duty of withdrawing the trust funds from his private business, and of holding and administering it as trustee, and for the performance of this duty his securities bound themselves as well and as fully as for its proper management after it came into his hands."

He then goes on to say that it "does not follow" that such neglect of duty will relieve the *first* bondsmen for a liability that existed when their bonds was in force and then says, (p. 603):

"If a third person had been appointed trustee, it would have been his duty to have collected the amount due from the curator or his securities. While a neglect to do so would create a liability on the part of the securities on his bond *as trustee for the losses thereby incurred,* it would not *alone* relieve his securities as guardian from their liability for the original default."

This would seem to mean, if it means anything at all, that if *Branch had been solvent* during the time of

the second bond (as Hardy was and, it seems, is now in the case at bar), so that he *could have* replaced the money but did not do it, then the second bondsmen would have been liable but this would not "*alone* relieve his securities as guardian (i. e. the first bondsmen) for the *original* default." (Italics ours). The case was reversed and remanded because the court then held that the ward was estopped.

At the time the foregoing appeals of the Branch case were decided and at the time the last one was determined (151 Mo. 622), the judgment against the second set of sureties had been obtained in a case where the evidence showed that Branch *was solvent*. On p. 632 of said last mentioned appeal it is shown that these second bondsmen had stipulated with the estate that the latter should sue the first bondsmen and that then the second bondsmen would pay if the suit against the first was unsuccessful. This was only another way of the second bondsmen obtaining contribution from the first set of bondsmen. The decision in 151 Mo. 622 held that there was no estoppel. And on page 637 the court analyzed the former appeals, saying they "expressly decided" that the conversion of the funds by Branch while curator and under the first bond could only be excused and such bondsmen "relieved of *their* liability" (italics ours) by showing either that he had the cash actually in hand or had replaced it after he became trustee; and that even though Branch may have been solvent, such fact "would not relieve the sureties on his bond as curator of *their* liability." (Italics ours). The court further goes on to say that a fiduciary cannot, by merely signing a receipt, and without having any funds at hand, *transfer* his and his first bondsmen's liability to the second set of sureties, (i. e. *excuse* the first and saddle it on the second alone); that by filing the receipt he asserted it was his intention to hold the estate as trustee and not as guardian" but if he did not have the estate in his hands *and by reason of his insolvency* was *unable to turn over the estate* he *could not,* and did not come into possession of the funds as trustee" (italics ours) and

thus *as guardian* he failed to carry out the orders of the probate court and the first bondsmen could not be relieved. Must this be regarded as impliedly holding that the *second set* of bondsmen would not have been *also* liable if Branch had been able to and did not replace the money? If so, it would seem to be because the principal cannot, *as to his sureties,* transfer his mere naked indebtedness from himself in either capacity; that is, *as to the second set of sureties* his individual debt to the estate is not a debt he owes to himself in the capacity in which he is *their* principal, but to himself in the capacity in which he was the principal on the *former* bond. In other words, it is not a debt which it is his official duty in his second capacity to collect, and therefore his second set of bondsmen are not liable for his failure to replace the fund even though he could have done so during the entire time of the second bond. But clearly he, in his second capacity, would have been the one to collect it had the debt been owed by some one else; and it is hard to see why a different rule should apply where he himself owes the debt and is able to pay it; and the language quoted from the decisions above show that the judges writing them did regard it as his duty to collect from himself the same as any other debtor and that for a failure to do so his second bondsmen should be held *if* it was possible for him to have collected it.

Be this as it may, however, we are relieved of the duty of interpreting the foregoing decisions as, in effect, relieving the second set of bondsmen in this case even though Hardy was and still is solvent. The Supreme Court in State ex rel. v. Elliott, 157 Mo. 609 (a suit against the second set of bondsmen), so held. It is true, in that case the evidence all tended to show the principal was insolvent at the time he converted the funds during the first bond and there was no evidence to show that he ever was otherwise. We think, however, that the ruling is as above indicated. Hence even if, as defend-ants contend, the money of the Miller heirs was converted during the first bond, we cannot hold the second set

of bondsmen liable on the ground that there was a *continuing* breach or a succession of breaches. Hence the second declaration hereinbefore mentioned as having been asked by the defendants should not have been refused. Nor should it be said that said second declaration was not in accord with the evidence because it required the finding that Hardy did not have the assets in his possession since "his possession" there means his *official* possession.

It is urged by plaintiff that even though defendant sureties cannot be held on the theory of continuing or successive breaches, nevertheless they should be held because the final settlement of Hardy was a *final judgment* conclusive on the sureties, and, therefore, they were not entitled to show a breach prior to their bond. The plaintiff objected and excepted to the admission of such evidence. But even if the so-called final settlement can be regarded as such (of which we are exceedingly doubtful, since the *court* did not order the notice required in section 456, Revised Statutes 1909, to be given, and no notice of *settlement* but only of an *intention to resign* was given), nevertheless such settlement cannot preclude the sureties from showing that they are not responsible for the payment of the balance therein shown. [Cases of State ex rel. v. Branch, supra.] If that settlement is anything, it is only prima-facie evidence of the amount due. Under a proper answer raising the defense here interposed, the sureties can show that the default was committed before their bond was executed. It was only for failure to *plead* such a defense that it was not allowed in State ex rel. v. Kennedy, 163 Mo. 510.

Again, the question of whether the one set of bondsmen or the other were responsible was not before the probate court for adjudication. Hence the judgment, if there was one, could not be *res adjudicata* as to that. [2 Woerner's Am. Admn. (2 Ed.), sec. 506; Black on Judgments, sec. 644; Nelson v. Barnett, 123 Mo. 564, 570; Bramell v. Adams, 146 Mo. 70, 87.] Furthermore, there was no formal order approving the settlement and

there was no approval save such as may be implied from the order to turn over.

It follows, therefore, that the court erred in refusing the declarations asked as aforesaid, and the judgment must be reversed and the cause remanded for a new trial. It is so ordered. All concur.